**Lewis R. Landau** (SBN 143391)
**Attorney-at-Law**
22287 Mulholland Hwy., # 318
Calabasas, California 91302
Voice & Fax: (888)822-4340
*Email: lew@landaunet.com*

Attorneys for Debtor and Plaintiff

**Daren R. Brinkman** (CA Bar No. 158698)
**Laura J. Portillo** (CA Bar No.186813)
**Kevin C. Ronk** (CA Bar No. 241598)
4333 Park Terrace Dr., Ste 205
Westlake Village, CA 91361
Phone:  (818) 597-2992
Fax:    (818) 597-2998
*Email: firm@brinkmanlaw.com*

Attorneys for Official Committee of
Creditors Holding Unsecured Claims and Plaintiff

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>Point.360, a California corporation,<br><br>Debtor.<br><br>Point.360, a California corporation, and the Committee of Creditors Holding Unsecured Claims,<br><br>Plaintiffs,<br><br>vs.<br><br>Medley Capital Corporation, a Delaware corporation, Medley Opportunity Fund II, LP,  a Delaware limited partnership,<br><br>Defendants. | Case No.:  2:17-bk-22432-WB<br>Adv. No.:  To be assigned<br><br>Chapter 11<br><br>**COMPLAINT FOR:**<br>1. **MANDATORY SUBORDINATION AND CLAIM DISALLOWANCE;**<br>2. **RECHARACTERIZATION AND CLAIM DISALLOWANCE;**<br>3. **OBJECTION TO CLAIM; AND**<br>4. **LIEN AVOIDANCE**<br>**[11 U.S.C. §§ 502(b)(1); 510(b); 506(d)]**<br><br>Date:      To Be Set<br>Time:     To Be Set<br>Place:     Courtroom 1375; Judge Brand<br>            US Bankruptcy Court<br>            255 E. Temple Street, 13th Floor<br>            Los Angeles, CA 90012 |

Plaintiff, Point.360, debtor-in-possession in the above-captioned bankruptcy case and as plaintiff in the above-captioned adversary proceeding ("Point.360" or "Debtor") and the Committee of Creditors Holding Unsecured Claims ("Committee") (Debtor and Committee individually a "Plaintiff" and collectively "Plaintiffs") hereby complain against Defendants, Medley Capital Corporation ("MCC") and Medley Opportunity Fund II, LP ("MOF II") (collectively MCC and MOF II are referred to herein as "Medley" or "Defendants"), as follows:

## STATEMENT OF JURISDICTION, PARTIES AND PROCEDINGS

1. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a), as this is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), (K) and (O). Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a), in that the instant proceeding is related to a case under title 11 of the United States Code which is still pending.

2. Debtor and Committee consent to entry of a final judgment by the Bankruptcy Court.

3. This is an adversary proceeding under Federal Rules of Bankruptcy Procedure 3007(b) and 7001(2), (8).

## PARTIES

4. Plaintiff, Point.360, is a corporation organized and existing under the laws of the State of California, with its principal place of business at 2701 Media Center Drive, Los Angeles, California. At all relevant times, Point.360 has been engaged in integrated media management services, including archival, closed captioning and subtitling, editing, encoding and transcoding, mastering, restoration, scanning, vaulting and worldwide physical and digital distribution of television programming, feature films and movie trailers.

5. On October 10, 2017, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor continues in possession of its property and manages its business as a debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

6. The Committee was duly appointed by the Office of the United States Trustee on March 22, 2018.

7. Defendant, MCC, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 280 Park Avenue, 6th Floor East, New York, New York.

8. Defendant, MOF, II is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business at 280 Park Avenue, 6th Floor East, New York, New York.

9. On January 30, 2018, MCC and MOF II filed Claim Nos. 72 and 73 respectively in Debtor's chapter 11 case. MCC and MOF II amended Claim Nos. 72 and 73 on November 7, 2018. True and correct copies of Claim Nos. 72 and 73 with the subsequent amendments are attached as Request for Judicial Notice ("RFJN") Exhibits 1 and 2 filed concurrently herewith and are incorporated herein by reference ("Claim Nos. 72 and 73").

## FACTUAL BACKGROUND

10. At all relevant times, Modern VideoFilm, Inc. ("MVF") was a Burbank, California based provider of post-production and distribution services to the film, television and media content industries.

11. In September 2012, Medley made a fifty-million-dollar loan to MVF. The subject loan replaced a then outstanding debt of $80,651,000 owed by MVF, and resulted in the forgiveness of $30,651,000, which MVF recorded as a gain in other income on MVF's statement of operations for the 2013 fiscal year.

12. Medley's loan to MVF bore interest at a combined 9% cash interest rate and 3% PIK rate, plus an applicable margin of the greater of 1.5% and LIBOR, maturing on September 25, 2017. As of May 31, 2015, MVF owed Medley $73,772,000 in unpaid loans, interest and fees, and faced future lease obligations of $36,567,000 through 2023.

13. Based upon MVF's alleged defaults, in July 2014, Medley took direct control of MVF, and appointed representatives of Deloitte Corporate Finance, LLC ("DCF") and Deloitte Transactions and Business Analytics, LLP ("DTBA")(collectively DCF and DTBA are referred to

herein as "Deloitte") as Medley's agents to assume the day-to-day operation of MVF. Specifically, Medley appointed Deloitte employees Scott Avila ("Avila") as MVF's Chief Restructuring Officer with the powers, duties and title of "CEO," and Cooper Crouse ("Crouse") as Assistant Chief Restructuring Officer with the title of "President."

14. In December 2014, Kevin McFarlane ("McFarlane"), Managing Director of DCF, introduced the Debtor to an opportunity to merge with MVF, representing that using Debtor's stock might be a way for both MVF and Debtor to expand their business and create a return for both Medley and Debtor.

15. For its part, Debtor was already experiencing its own financial challenges. Debtor had suffered pre-tax losses of $1.2 million in 2013, and $2.7 million in 2014, based upon substantially lesser sales than MVF. In December 2014, Debtor's existing lender cancelled the availability of funds under Debtor's revolving credit facility due to the Debtor's failure to meet its financial covenants. Additionally, due to the Debtor's failure to meet financial covenants in the past, and uncertainty regarding the Debtor's ability to meet new covenant requirements, Debtor was required to classify the balance owed for its mortgage debt and capital leases as a current liability in its consolidated balance sheet as of December 31, 2014, and in its Form 10-Q for the quarterly period ended December 31, 2014.

16. Upon information and belief, prior to approaching Debtors, Defendants and Deloitte had been unsuccessfully marketing MVF to other potential purchasers, as evidenced by the creation of a data room of historical and current MVF data and financial information which Debtor was given access to on March 4, 2015.

17. Defendants apparently determined that their only viable path forward was to accommodate MVF's *de facto* sale as a going concern to Debtor, with the hope that the economies of scale achievable by the merger of MVF and Debtor would permit Defendants to: (1) report that

they had avoided the total loss of their investment in MVF, (2) avoid the prospect of incurring the foregoing wind-up costs, and (3) at least potentially obtain a return on its loans to/investment in MVF by acquiring a substantial equity stake in Debtor.

18. On or about March 19, 2015, McFarlane provided Debtor with an initial term sheet, which contemplated: (1) the sale of MVF's assets in return for Debtor's payment of cash and grant of Debtor's stock to Medley, and (2) positions on Debtor's board of directors held by board members designated by Defendants. No extension of credit by Medley to Debtor was mentioned in the initial term sheet.

19. On or about March 23, 2015, a telephonic meeting between Debtor's representatives, Avila and McFarlane was held to discuss the initial term sheet. At this and ensuing meetings, Avila and Crouse emphasized their experience in the industry, citing their previous experience working together for Deloitte at Culver Studios, in Culver City, California.

20. On or about March 26, 2015, a face-to-face meeting between Debtor's representatives and various representatives of Medley and Deloitte took place at Deloitte's Los Angeles office.

21. On April 2, 2015, Medley and Deloitte provided the Debtor with a consolidation model based upon a merger with the Debtor which reflected that MVF's revenue would drop from $44 million to $29 million, but, based upon economies of scale, MVF's operating income and EBITDA would increase to $3.6 million and $4.1 million respectively.

22. On or about April 29, 2015, a face-to-face meeting between Debtor's representatives, and representatives of Medley and Deloitte took place at Medley's office in New York. The agenda for the meeting prepared by Medley included discussion of: (1) "integration costs as well as the bearer of these costs"; (2) a "[p]lan to finance working capital needs for

integration and growth"; and (3) an "[e]quity split." During the meeting, Defendants and their agents again described the proposed transaction as an "equity play."

23. On May 14, 2015, Debtor's CFO, Alan Steel, wrote to Avila raising a number of significant issues. Among the issues Steel raised was the fact that the Debtor "contemplate[d] that the MVF [merger would] generate at least $3 to $4 million of negative cash flow" by the end of 2015. Avila responded, in part, that the "funding [Medley] is providing is intend[ed] to finance the transition."

24. Additionally, Steel expressed concern that "overburdening the combined entity with too much debt and not enough equity … will impair value creation." Avila responded that "I completely understand. So I recommend we address this in the due diligence process through the financial projections…."

25. Finally, Steel stated that Debtor needed "to see an updated first 12-month sales and cash flow forecast considering the possible effects of the announced Warner Bros./Deluxe deal," as Defendants and their agents had previously identified Warner Brothers as MVF's largest customer. Avila responded:

> I completely understand the fear that you and your team have regarding a deal of this magnitude in light of all the issues at Point360 and MVF. I am sure you can understand **Medley's prospective [sic] (a) a minority investment, (b) cash investment in addition to asset contribution**. One thing I can say is that if we do this Point360 gets a strong, stable and sophisticated capital partner which has the demonstrated record of supporting its management teams and companies – this is clearly something you don't have today.

(**Emphasis added**).

26. On May 20, 2015, the parties entered into a signed term sheet which called for Medley to receive 37% of the common stock of Point.360, to have two Medley representatives on the Point.360 Board of Directors, and to make a $5 million term loan to Point.360 "to fund capital expenditures in connection with the build-out of [Point.360] to accommodate the transfer from

MVF's Burbank, Santa Monica and Glendale facilities … and for working capital." The subject term sheet also provided that Point.360 would "not issue any public announcement about the Transaction without the approval of Medley…."

27. On July 8, 2015, Debtor and Medley contemporaneously executed and closed on the "Sale Agreement Pursuant to Article 9 of the Uniform Commercial Code" ("the Sale Agreement") and the closely related "Term Loan Agreement" ("TLA") and Security Agreement.

28. Throughout their negotiations, Debtor and Medley treated the Sale Agreement, TLA and Security Agreement as a single transaction and agreement ("the Transaction"). The parties conducted all the negotiations relating to the Sale Agreement, TLA and Security Agreement based upon that understanding.

29. The Bankruptcy Court determined that the Sale Agreement, TLA and Security Agreement are integrated contracts in connection with granting summary judgment in adversary proceeding 2:18-ap-01435 WB per order entered March 11, 2019.

30. Pursuant to the Sale Agreement, ***Debtor paid no cash to Medley. Rather, Medley obtained 2,000,000 shares and 800,000 warrants in Debtor***. (Sale Agreement at § 1.3).

31. Pursuant to the Sale Agreement, Debtor granted Medley two (2) seats on Debtor's expanded seven person board (initially Feeley and fellow Medley Senior Managing Director and Head of Tactical Opportunities, James D. Frank). (Sale Agreement at § 4.2(a)).

32. Additionally, pursuant to the Sale Agreement, Debtor agreed to make employment offers to *all* existing employees of MVF in substantially similar roles and with the same annual salary, and to pay certain PTO, sparing Defendants potential state and federal WARN Act liability. (Sale Agreement at §§ 1.2 and 4.8).

33. As a result of closing on the transaction, Debtor's bi-weekly employee payroll increased from $485,532 ($12,623.832 annually) to $1,276,272 ($33,183.072 annually), a nearly three-fold increase.

34. Finally, the Sale Agreement provided that, upon the closing of the Sales Agreement, Medley was obligated to provide Point.360 with a $6 million five year term loan. (Sale Agreement at § 4.10).

35. The Sale Agreement is expressly governed by California law.

36. Contemporaneously, the Debtor and Medley entered into the TLA and Security Agreement. The TLA was expressly conditioned upon the closing of the Sale Agreement. (TLA at §§ 1.(a) and 5(c).

37. The final paragraph of Section 1(a) of the TLA expressly provided:

> **In consideration for the Term Loans**, the [Debtor] shall issue to [Medley] five year warrants (the "*Warrant*") … to purchase an aggregate 500,000 shares (the "*Warrant Shares*") of common stock of the [Debtor]….

(**Bold added**)(*italics in original*).

38. The TLA further recited that the loan proceeds:

> [S]hall be used solely (i) to refinance certain indebtedness of the Borrower, (ii) to pay the transaction fees, costs and expense incurred directly in connect with the transaction contemplated hereby, (iii) for capital expenditures in connection with the build-out and integration of the Borrower's business following the acquisition of substantially all of the asset of [MVF], and (iv) for working capital and general corporate purposes of the Borrower.

39. Pursuant to the TLA, Debtor was not required to make any payments to Medley until the end of the five year term. Section 2 of the TLA provided that interest, at the election of the Debtor, could be capitalized and added to the principal amount due at the end of the term.

40. Section 3 of the TLA called for interest to be paid of 6.0% plus the three month LIBOR rate published in the WSJ.

41. At the time the Debtor entered into the Sale Agreement, TLA and Security Agreement, Debtor could not have obtained a similar arms-length loan from an independent lender.

42. Shortly after the closing, on August 12, 2015, Medley hosted a quarterly-earnings call with analysts. When Medley's Chairman and CEO, Brook Taube ("Taube") was asked about any lessons Medley had learned from underwriting the toxic MVF loan, Taube pivoted to a description of the MVF-Point.360 merger. After describing the combined company as a "very strong number two player" in the marketplace, he added: "[o]ur assessment was this was the best opportunity to maximize the value [of the MVF loss/investment] over time." Taube added "our team is going to be focused extremely hard on supporting this business and getting back as much of our initial[] investment [in MVF] as we possibly can."

43. As of the closing date of the MVF transaction on July 9, 2015, Debtor's total unsecured debt (excluding its capital leases, term loans and line of credit – which were secured by Debtor's fixed assets and/or accounts receivable -- and including accrued vacation for Debtor's employees) was less than $745,000. On the date Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code, that figure had increased nearly six-fold to $4,235,547.

44. During its 2015 fiscal year ending June 30, 2015, Debtor sustained an operating loss of $2.95 million, the same operating loss it had sustained for the 2014 fiscal year. After the July 8, 2015 Transaction, Debtor suffered operating losses in excess of $8.9 million during the 2016 fiscal year and $9.9 million in 2017, owing primarily to massive increases in the cost of services sold and selling, general and administrative expenses.

45. On March 31, 2016, less than nine months after the closing on the Sale Agreement, TLA and Security Agreement, the Medley designees on the Debtor's Board of Directors resigned.

**FIRST CLAIM FOR RELIEF**

**(Mandatory Subordination Pursuant To 11 U.S.C. § 510(b) and**

**Disallowance under 11 U.S.C. § 502(b)(1))**

46. Plaintiffs reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 45 as though set forth in full.

47. Section 510(b) of the Bankruptcy Code requires that a claim arising from the purchase or sale of a security of a debtor must be subordinated to all claims that are senior to or that equal the holder of that claim. If, as here, the security is common stock, the holder of the claim has the same priority as current holders of common stock.

48. Section 1 of the TLA attached as Exhibit 1 to the MCC and MOF II Claim Nos. 72 and 73 ("Term Loan Agreement") recites that the Debtor's issuance of equity securities to MCC and MOF II constitutes consideration for the Term Loans:

> In consideration for the Term Loans, the Borrower shall issue to the Lender five-year warrants (the "Warrant"), substantially in the form attached hereto as Exhibit C, to purchase an aggregate 500,000 shares (the "Warrant Shares") of common stock of the Borrower, at an exercise price of $0.75 per share.

49. Pursuant to Section 24 of the TLA, the Term Loans and Warrants are deemed to be the Debtor's issuance of an "investment unit" under the Internal Revenue Code.

50. Under Ninth Circuit law, "[i]f the promissory note claims are linked to the [issuance of securities], they should be subordinated." In re Betacom of Phx., Inc., 240 F.3d 823, 831-832 (9th Cir. 2001).

51. Medley's Term Loan Agreement and promissory note claims are *expressly linked* to the issuance of securities as the recited consideration for the Term Loan Agreement.

52. The economic reality of the Transaction further evidences the close nexus between the purported "loan" and the purchase of Debtor's securities in return for Medley's contribution of MVF's assets.

53. Debtor lacked the working capital and/or credit to purchase MVF's assets and offer employment to MVF's nearly three hundred employees pursuant to § 4.8 of the Sale Agreement,

1 and lacked the creditworthiness to obtain arms-length financing for the Transaction from any other source.

54. Defendants were fully aware that, without their extension of purported "credit" on materially better terms than the Debtor could have obtained from any other informed lender, the Transaction could not, and would not, have occurred.

55. Defendants entered into the TLA as a part of the Transaction with the expectation, and for the sole purpose, of acquiring the Debtor's securities and potentially enhancing the value of the substantial equity interest in the Debtor which Defendants were obtaining in the Transaction.

56. Defendants would not have entered into the Transaction and/or the TLC, but for the Debtor's issuance of a combined 2,000,000 shares of Debtor's common stock and 1,300,000 warrants to purchase Debtor's common stock and such equity securities were the primary return expectation for Medley.

57. MCC and MOF II Claim Nos. 72 and 73 are claims for damages arising from the purchase or sale of an equity security consisting of warrants for common stock of the Debtor.

58. Pursuant to 11 U.S.C. § 510(b), MCC and MOF II Claim Nos. 72 and 73 are subject to mandatory subordination and shall be treated with the same priority as common stock.

59. MCC and MOF II Claim Nos. 72 and 73 are unenforceable against the Debtor or property of the Debtor and are subject to disallowance under 11 U.S.C. § 502(b)(1).

## SECOND CLAIM FOR RELIEF

### (Recharacterization and Disallowance under 11 U.S.C. § 502(b)(1))

60. Plaintiffs reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 59 as though set forth in full.

61. MCC and MOF II allege claims for debt in Claim Nos. 72 and 73 consisting of Term Loans granted under Medley's TLA.

62. The economic reality of the MCC and MOF II Claim Nos. 72 and 73 is that the Medley Term Loans are in economic substance an equity contribution rather than a true debt obligation.

63. Debtor lacked sufficient capital to move forward with the Transaction.

64. Debtor lacked sufficient capital to obtain a loan on terms equivalent to those provided for in the TLA from an informed outside lender.

65. The amount of the "term loan" provided coincided with the anticipated capital required to fund PTO related to the MVF employees hired by the Debtor, to pay for rent for the post-closing period necessary to complete the move of MVF's equipment to the Debtor, and for the anticipated first year negative cash flow during the transition from two separate companies to a single consolidated operation.

66. The Term Loans in MCC and MOF II Claims Nos. 72 and 73 did not require payments for a five-year term.

67. When granting the Term Loans, Medley became both a purported creditor and equity security holder.

68. Medley obtained two (2) seats on Debtor's board of directors.

69. Although Medley obtained collateral for the alleged Term Loans, Medley authorized senior mortgage borrowings up to $5 million and senior credit facilities of $7 million.

70. The Medley Term Loans were subordinate to the claims of certain outside creditors.

71. The Medley advances were not used to acquire capital assets but were instead used to sustain operations.

72. Debtor had no sinking fund to provide for repayments.

73. The Court should find and determine that Medley's Term Loans constitute equity capital contributions to the Debtor, do not constitute *bona fide* indebtedness and are unenforceable against the Debtor or property of the Debtor pursuant to 11 U.S.C. § 502(b)(1).

## THIRD CLAIM FOR RELIEF

### (Objections to Claims under 11 U.S.C. § 502(b)(1); FRBP 3007(b))

74. Plaintiffs reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 73 as though set forth in full.

75. Pursuant to 11 U.S.C. § 502(b)(1), "[e]xcept as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that — (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."

76. Based on the claims set forth hereinabove, MCC and MOF II Claim Nos. 72 and 73 are unenforceable against the debtor and property of the debtor under applicable law.

77. Plaintiffs request entry of a judgment disallowing MCC and MOF II Claims Nos. 72 and 73.

## FOURTH CLAIM FOR RELIEF

### (Lien Avoidance under 11 U.S.C. § 506(d))

78. Plaintiffs reallege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 77 as though set forth in full.

79. Pursuant to 11 U.S.C. § 506(d), "to the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void."

80. To the extent the MCC and MOF II Claims Nos. 72 and 73 are disallowed under 11 U.S.C. § 502(b)(1), any Medley lien securing such claim is void.

81. Plaintiffs request entry of a judgment voiding Medley's liens upon disallowance of MCC and MOF II Claims Nos. 72 and 73.

///

///

///

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1. Entry of a judgment for mandatory subordination under 11 U.S.C. § 510(b) and disallowance of MCC and MOF II Claim Nos. 72 and 73 under 11 U.S.C. § 502(b)(1).

2. Entry of a judgment recharacterizing MCC and MOF II Claim Nos. 72 and 73 as a capital contribution equity interest in the Debtor and disallowing Claims Nos. 72 and 73 under 11 U.S.C. § 502(b)(1).

3. Entry of a judgment disallowing MCC and MOF II Claims Nos. 72 and 73 under 11 U.S.C. § 502(b)(1).

4. Entry of a judgment voiding Medley's liens under 11 U.S.C. § 506(d) upon disallowance of MCC and MOF II Claims Nos. 72 and 73 under 11 U.S.C. § 502(b)(1).

5. For attorney's fees and costs pursuant to contract.

6. For such other and further relief as the Court deems just and proper.

Dated: May 1, 2019

**Lewis R. Landau**
**Attorney at Law**

By:*/s/ Lewis R. Landau*
Lewis R. Landau
Attorney for Debtor

Dated: May 1, 2019

**Brinkman Portillo Ronk APC**

By:*/s/ Daren R. Brinkman*
Daren R. Brinkman
Attorneys for the Committee